SHELLEY C. CHAPMAN, UNITED STATES BANKRUPTCY JUDGE
*682 Before the Court is the application (the "Application") of the Debtors to (a) retain Alvarez & Marsal North America, LLC ("A & M") to provide the Debtors an interim Chief Executive Officer and certain additional personnel and (b) designate Mr. Ralph Schipani as interim Chief Executive Officer for Nine West Holdings, Inc. and its debtor affiliates nunc pro tunc to April 6, 2018 (the "Petition Date").[2] In support of the Application, the Debtors filed the Declaration of Mr. Ralph Schipani [Dkt. No. 207] and the Supplemental Declaration of Mr. Schipani [Dkt. No. 419] ("Schipani Suppl. Decl.").
The sole objection to the relief sought by the Application (the "Objection") was filed by the Office of the United States Trustee (the "U.S. Trustee") on June 21, 2018, together with the Declaration of Andrea Schwartz in support of the Objection [Dkt. Nos. 408 and 409]. Six statements in support of the Application were filed by creditors and/or creditor groups representing virtually all levels of the Debtors' capital structure: (i) Wells Fargo Bank, National Association, in its capacity as ABL/FILO DIP Agent and Prepetition ABL/FILO Agent; (ii) an ad hoc group formed by certain lenders (the "Ad Hoc Secured Lender Group") that collectively beneficially own or manage (or are investment advisors or managers for funds that beneficially own or manage) approximately (a) $227.5 million in aggregate principal amount of the loans under that certain Term Loan Credit Agreement, dated as of April 8, 2014 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Secured Term Loan Credit Agreement"), (b) $17.5 million in aggregate principal amount of the loans under that certain Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement, dated as of April 11, 2018 (as amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Term Loan Credit Agreement"), and (c) $17.5 million in commitments for future fundings under the DIP Term Loan Credit Agreement; (iii) the so-called Ad Hoc Group of Crossover Lenders, a group of holders of loans under the Prepetition Secured Term Loan Credit Agreement and loans under that certain Unsecured Term Loan Credit Agreement, dated as of April 8, 2014 (the "Prepetition Unsecured Term Loan Credit Agreement"); (iv) GLAS Trust Company, LLC, in its capacity as Administrative Agent under the Prepetition Unsecured Term Loan Credit *683 Agreement; (v) Brigade Capital Management, LP, one of the Debtors' largest economic stakeholders, serving as (a) a lender under the DIP Term Loan Credit Agreement, (b) a holder of loans under the Prepetition Secured Term Loan Credit Agreement, (c) a holder of loans under the Prepetition Unsecured Term Loan Credit Agreement, and (d) a holder of 8.25% Senior Notes Due 2019; and (vi) the Official Committee of Unsecured Creditors. Replies to the Objection were filed by the Debtors [Dkt. No. 420] ("Debtors' Reply") and by A & M [Dkt. No. 426] ("A & M Reply").
The legal issue presented is a narrow, technical one: should the Debtors be permitted to retain A & M under section 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), as requested by the Application, or must the retention of A & M be considered solely under section 327(a) of the Code, as the U.S. Trustee asserts? The U.S. Trustee argues that A & M and Mr. Schipani are professional persons within the meaning of section 327 of the Code and that employment of professional persons must be accomplished solely and exclusively under section 327; the U.S. Trustee submits that a debtor cannot use section 363(b) to employ a professional person. Taking its argument a step further, the U.S. Trustee posits that A & M cannot meet the disinterestedness requirement of section 327(a) and that, therefore, the Application must be denied.
The Debtors and A & M vehemently disagree with the arguments of the U.S. Trustee, pointing out that retention of distressed management consultants has been authorized pursuant to section 363(b) in dozens of other bankruptcy cases where the engagement satisfies the business judgment standard, and that the Objection directly contradicts the U.S. Trustee's national policy over the last 14 years of explicitly assenting to retention applications for management consultants pursuant to section 363(b) in similar circumstances, some involving A & M and others involving other turnaround consulting firms and personnel. Moreover, the Debtors and A & M argue that, in the context of these cases, A & M is not functioning as a "professional person" as such term is used in section 327(a), and that section 363(b) provides the appropriate basis for granting the Application.
A hearing on the Application was held today, June 28, 2018 (the "Hearing"). At the Hearing, the Court heard live testimony from Mr. Ralph Schipani.
The Court assumes familiarity with the general background facts of the Debtors' cases; its findings in this Bench Decision pertain solely to the facts surrounding the role of A & M and Mr. Schipani in these cases. The facts described herein are contained in the record and shall constitute the Court's findings of fact.
Background
For over four years, A & M has been providing vital management services to the Debtors and their non-debtor affiliates. Pursuant to A & M's prepetition engagement letter, which is attached to the Debtors' Reply as Exhibit A ("A & M 2014 Engagement Letter"), A & M was hired in April 2014 to assist two separate companies-Jones Holdings LLC and Nine West Holdings Inc.-in achieving strategic and operational goals, namely an internal restructuring of operational functions across the companies' business units following their acquisition by Sycamore Partners, L.P. (Schipani Supp. Decl. ¶ 3; Ex. A to Debtors' Reply (A & M 2014 Engagement Letter) ). Following the acquisition, the new board of directors sought the assistance of A & M to implement the new business plan, which focused on organizing and developing the company's various *684 brands and lines as separate business units. (Schipani Suppl. Decl. ¶ 2).
A & M's Role
Since April 2014, A & M has provided vital management services to the Debtors and their non-debtor affiliates and has overseen virtually all aspects of their day-to-day operations. The duties of A & M personnel and Mr. Schipani have included, among other things, (a) supervising and assisting in operations, finance, accounting, and treasury functions; (b) assisting in the identification of cost reductions and other operational improvements; and (c) assisting in the evaluation and development of budgets and business plans. (Ex. A to Debtors' Reply (A & M 2014 Engagement Letter) ¶ 1(b) ). A & M was engaged to manage the day-to-day operations of the business and supplement traditional in-house functions.
As stated by Mr. Schipani in his Supplemental Declaration, A & M was not hired to restructure the obligations of the company, and nothing in A & M's prepetition engagement related to bankruptcy planning; rather, it was not until approximately three years after the engagement began, during the summer of 2017, that the company, in consultation with advisors and independent of A & M's activities and responsibilities, began considering the possibility of a bankruptcy filing. (Schipani Suppl. Decl. ¶ 6).
Since the Petition Date, A & M has continued in its role of managing the daily operations of the Debtors' business; any services it has performed relating to the Debtors' chapter 11 process have been services that could have been performed by existing company personnel, rather than A & M personnel, had the necessary resources been available within the company. (Schipani Suppl. Decl. ¶ 7). For example, A & M personnel assisted in the company's preparation of bankruptcy schedules and disclosures, which bolstered the function of the finance department and was, as Mr. Schipani states, "a necessary extension and continuation of the A & M team's existing role in managing operations." (Id. ). A & M has continued to provide the type of services it has provided to the company for years, and such work supports the professionals hired by the Debtors specifically for bankruptcy purposes, in Mr. Schipani's words, "in the same way that in-house employees and officers of any company going through a restructuring typically would in my experience." (Schipani Suppl. Decl. ¶ 8). Significantly, Mr. Schipani and his team played an instrumental role in achieving significant success in the recent sale of certain of the Debtors' assets for a winning bid well over 50% higher than the stalking horse bid, which secured over $140 million of additional value for the Debtors' estates.
Mr. Schipani's Role as Officer
At the outset of the A & M engagement in 2014, Mr. Schipani served initially as Interim Vice President of Operations; his principal focus then was assisting the company with an internal restructuring of operational functions across various business units. (Schipani Suppl. Decl. ¶ 3). Subsequently, during A & M's prepetition engagement, Mr. Schipani also served in each of the following roles: (i) commencing after the acquisition, as Interim President of Shared Services, where he was tasked with determining which shared services would be distributed to each of the business units, assigning employees to the different units, and managing the team that ran the non-redistributed services functions; (ii) commencing in May 2015, as Interim President of Nine West Holdings, Inc., where Mr. Schipani was responsible for public financial reporting, conducting earnings calls, and overseeing cash flow management, overall capital management, and the creation of annual business plans; and (iii) commencing in June 2016, as Interim *685 CEO of Nine West Holdings, Inc., where he "assumed responsibility for all aspects of the Company, including ensuring that the business plans of the individual business unit heads were coordinated and executed in a consistent manner" and where he became involved with the sale of the Easy Spirit brand and the acquisition of Kasper Topco Limited in January 2017. (Schipani Suppl. Decl. ¶¶ 3-5, 11).
Mr. Schipani's Role as Member of Subsidiary Boards
At the time of A & M's engagement, Mr. Schipani served as an officer but not as a director of certain of the Debtors. When the Interim Chief Operating Officer, Mr. Andrew Hede (another A & M Managing Director who had been appointed in connection with A & M's engagement) ceased working on the A & M engagement, Mr. Hede resigned from his positions on the boards of certain of the Debtors' subsidiaries or affiliates. (Schipani Suppl. Decl. ¶¶ 10-11). At that time, in May 2015, Mr. Schipani was appointed to replace Mr. Hede on the boards of Dongguan Jones Commerce and Trading Co. Ltd. and Kasper Global Limited. In September 2015, when Mr. Christopher Cade, Chief Financial Officer, resigned from his positions on certain subsidiary boards, Mr. Schipani was appointed to replace Mr. Cade on the subsidiary boards from which he was departing. Around this time, Mr. Schipani was appointed to the boards of two other subsidiaries (Nine West Group International Limited and GRI Group Ltd.) to replace a company employee who had resigned from her positions. Mr. Schipani was also appointed to the board of Kasper Topco Limited when the company acquired the entity in January 2017.
All of Mr. Schipani's board appointments were made pursuant to the request of and under the supervision of the Debtors' parent level boards, on which he did not serve. (Schipani Suppl. Decl. ¶ 12).
The only legal entity that is a Debtor in these cases on whose board Mr. Schipani has served within the past two years is One Jeanswear Group Inc. Mr. Schipani and Mr. Joseph Donnalley (another officer of the company) served as the two members of this entity's board following Mr. Cade's resignation in September 2015. After Mr. Donnalley left the company in October 2016, Mr. Schipani served as the sole board member of One Jeanswear Group Inc. from October 2016 until August 2017, when Mr. Alan Miller and Mr. Harvey Tepner were appointed as additional board members. (Schipani Suppl. Decl. ¶ 13). Mr. Schipani resigned from each of his board positions on November 22, 2017. (Schipani Suppl. Decl. ¶ 14).
Mr. Schipani's role on each subsidiary board on which he served was "strictly administrative and did not entail substantive decision making as a director." (Schipani Suppl. Decl. ¶ 15). The boards on which he sat did not hold any meetings. His actions as a director were limited to signing written consents to enact decisions that were directed by the parent board, and he did so fewer than twenty times over the two-year period during which he served on the boards. (Id. ). Prior to approving a transaction as a director, Mr. Schipani had already conducted a "substantive review and deliberation" in his capacity as an officer, and it was incidental that he would sign a written consent in his role as a director in order to formalize the approval. (Schipani Suppl. Decl. ¶¶ 15-16). At the Hearing, Mr. Schipani provided an example of this by referring to his vetting of the amendment of the ABL Credit Agreement in his role as an officer, after which he signed a written consent to the amendment in his role as a director. At no time did Mr. Schipani serve on the board of either (i) Debtor parent Jasper Parent LLC or (ii) lead Debtor Nine West Holdings Inc.; these two boards made all decisions *686 with respect to the prepetition and postpetition retention and compensation of officers of the company and of professional firms such as A & M. (Schipani Suppl. Decl. ¶ 18).
As set forth in his Supplemental Declaration, of the approximately 9,857 hours Mr. Schipani billed between April 2014 and the Petition Date in connection with A & M's engagement by the company, he estimates that he spent less than one half of one hour, in total, on all matters relating to his service on the subsidiary boards. (Schipani Suppl. Decl. ¶ 17).
Discussion
I. Section 363(b) of the Bankruptcy Code
Pursuant to section 363(b) of the Bankruptcy Code, after notice and hearing, a debtor has broad discretion to "use, sell, or lease, other than in the ordinary course of business, property of the estate," so long as such use is supported by a good business reason. 11 U.S.C. § 363(b)(1) ; see, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.) , 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him [or her] at the hearing a good business reason to grant such an application.").
The Debtors and A & M submit that, pursuant to section 363(b), the Court may authorize the Debtors' retention of A & M and of Mr. Schipani as Interim CEO. They cite to numerous decisions and orders from this District and other districts in which courts have relied on section 363(b) to authorize debtors to retain management consultancy firms, including where a firm's personnel were expected to fill key officer roles and manage the debtor's day-to-day business. See e.g., In re Enron Corp. , No. 01-16034, 2006 WL 1030421, at *2 (Bankr. S.D.N.Y. Apr. 12, 2006) (noting that court authorized the debtors, under section 363(b), to retain a management consulting firm to provide a chief executive and chief restructuring officer and additional individuals to serve as additional personnel during the chapter 11 cases); In re Ajubeo LLC , No. 17-17924, 2017 WL 5466655, at *4 (Bankr. D. Col. Sept. 27, 2017) (approving retention of management consulting firm to provide a chief restructuring officer under section 363(b) ); In re Copenhaver, Inc. , 506 B.R. 757, 764-65 (Bankr. C.D. Ill. 2014) (holding that the retention of a current director as consultant and chief restructuring officer under section 363(b) would be appropriate given the "unique and compelling circumstances" of the case, subject to modification of the court's oversight of the officers' fees); In re Toisa Limited , No. 17-10184 (Bankr. S.D.N.Y. Jan. 22, 2018) [Dkt. No. 458] (approving employment of a chief restructuring officer pursuant to section 363(b) ); see also Debtors' Reply n.5 (citing orders entered by this Court authorizing retention pursuant to section 363(b) in sixteen cases); A & M Reply ¶ 22 (citing additional orders entered by this Court). In addition, with respect to A & M specifically, Exhibit A to the A & M Reply lists thirty-seven bankruptcy cases in which A & M itself has been retained as a management consultant pursuant to section 363 of the Bankruptcy Code. Notably, except in the case of In re Toisa Limited , the U.S. Trustee did not object in any of the cited cases to the debtor(s)' request to employ the advisors, consultants, and/or chief restructuring officers pursuant to section 363(b) of the Code nor press the position taken here today that such retentions could only proceed under section 327.
Seemingly ignoring this mountain of precedent, the U.S. Trustee argues that there is "a limited body of case law under which courts have approved the retention of restructuring professionals under *687 section 363 and section 105(a)." (Objection, 22). With respect to cases referenced in which A & M was retained pursuant to section 363(b), the U.S. Trustee attempts to distinguish this case from those, asserting that "[n]one involved the retention of A & M to provide an interim CEO and certain additional personnel, and nearly all involved the retention of A & M to provide a Chief Restructuring Officer and other additional personnel or financial advisory services." (Objection, 5).
The Court is not persuaded by any of the U.S. Trustee's arguments with respect to section 363(b) and the Debtors' alleged inability to utilize this section of the Code to provide the basis for retention of A & M and Mr. Schipani in this case. First, with respect to the plethora of cases cited in which section 363(b) has been relied on for the retention of A & M (without objection by the U.S. Trustee), the Court observes that the U.S. Trustee's narrow, factual distinction between the retention of Mr. Schipani as CEO here and the retention of an A & M professional as CRO in the previous engagements is nonsensical. Is the U.S. Trustee's position that retention of a CRO can be authorized under section 363 but retention of a CEO cannot? While it is true that the Debtors seek to retain Mr. Schipani as CEO and not as CRO, the U.S. Trustee's position here is that A & M and Mr. Schipani cannot be retained under section 363 and must be retained under section 327 because they are playing an intimate, significant, and central role in the Debtors' reorganization and are thus "professional persons" as such term is used in section 327(a) of the Code. (Objection, 18). Had the Debtors sought to retain Mr. Schipani as CRO, however, it appears likely that the U.S. Trustee's position with respect to section 327 would remain unchanged; he would argue that the principal duties of a CRO are to provide support in a bankruptcy case and thus retention under section 327 is required.
The distinction that that U.S. Trustee attempts to make in his Objection is simply illogical. Moreover, a close examination of the thirty-seven cases listed on Exhibit A to the A & M Reply reveals that A & M was not in fact retained to provide solely a CRO and other additional personnel to the debtors in each and every one of such cases. Instead, here, as in many of the cited cases, A & M employees were retained pursuant to section 363(b) to serve as additional officers of the debtors, including in roles such as Interim Chief Executive Officer, Interim Chief Financial Officer, Interim Chief Operating Officer, and Interim Vice President of Finance, and to provide additional A & M personnel to assist such officers. See, e.g., In re Angelica Corp., et al. , No. 17-10870 (Bankr. S.D.N.Y. May 4, 2017) [Dkt. No. 149]; In re Ignite Restaurant Group, Inc., et al. , No. 17-33550 (Bankr. S.D. Tex. Jun. 28, 2017) [Dkt. No. 255]; In re Local Insight Media Holdings, Inc., et al. , No. 10-13677 (Bankr. D. Del. Dec. 17, 2010; Feb. 11, 2011) [Dkt. Nos. 162, 333].
a. The Jay Alix Protocol
The U.S. Trustee's position that section 363(b) cannot provide the basis for retention of distressed management consultants such as A & M here lacks intellectual honesty and consistency, particularly when considered in light of the so-called Jay Alix Protocol adopted by the U.S. Trustee fourteen years ago. The full text of the Jay Alix Protocol (the "Protocol") can be found on the website of the U.S. Trustee.[3] The Protocol is not a provision of the Bankruptcy Code. It is not law, and it *688 is not binding on this Court or any other court. As Joe Guzinski, then acting general counsel for the Executive Office for U.S. Trustee, stated on November 13, 2001,
We have seen any number of situations where turnaround or other advisory services seek to be retained as professionals under Section 327 and also have a role in management .... In our view, that renders them an insider and, therefore, not disinterested. This protocol makes clear how advisory firms will work with the debtor in the future, at least in a way that's acceptable to the UST. We have some cases pending against certain firms at this point-there are some agreements pending that we're trying to bring in under the protocol. The protocol right now only applies to cases in Region 3. But we anticipate making it a policy nationwide after discussion with the USTs.
(See "EOUST SAYS JAY ALIX PROTOCOL WILL BE NATIONAL POLICY," Bankruptcy Court Decisions Weekly News & Comments, 38 No. 14 Bankr. Ct. Dec. News 1 (November 13, 2001) ).
The Protocol began as a settlement agreement executed in 2004 between the U.S. Trustee and Jay Alix & Associates, a management consultancy firm, in a bankruptcy case unrelated to this one; it has developed into a national policy adopted by the U.S. Trustee whereby the U.S. Trustee assents to-indeed, directs-the retention of distressed management consultants by a debtor pursuant to section 363 of the Code as long as the firm complies with certain requirements contained in the Protocol. (See Protocol §§ I.A-C (defining crisis management engagements to include any engagement where the firm "furnishes interim executive officers" either prepetition or postpetition and stating that crisis management firm "shall seek retention under section 363 of the Bankruptcy Code") ).
As correctly summarized by the Debtors in their Reply, the core requirements of the Protocol include the following:
(a) the firm sought to be retained must serve in only one capacity (i.e. , as either a financial advisor, crisis manager, claims agent, or investor);
(b) the firm's retention application must be filed under section 363 of the Bankruptcy Code and the application must disclose the firm's relationships with interested parties and make other disclosures showing the firm is otherwise disinterested;
(c) the firm must file monthly staffing reports, which must be subject to Court review; and
(d) retention of persons furnished by the firm must be approved by and act under the direction of an independent board of directors.
Requiring parties to comply with the Protocol has served as a way to avoid conflicts of interest. More specifically, the Protocol's "one hat" rule (which requires that the firm sought to be retained serve the debtor in only one capacity) is designed to avoid the "inherent conflict" between an advisor's duty to a debtor and its own business interests where the advisory firm serves both as a financial advisor retained pursuant to section 327 of the Bankruptcy Code and as a crisis manager with firm staff serving as officers of the debtor corporation. See In re Saint Vincent's Catholic Med. Centers of New York , No. 05-14945, 2007 WL 2492787, at *3 n.3 (Bankr. S.D.N.Y. Aug. 29, 2007). Put simply, the Protocol was designed to prevent a party from using its position in one capacity to benefit itself in another capacity. Footnote three to the Protocol states that a financial advisor "shall not seek to be retained in any capacity in a bankruptcy proceeding for an entity where any principal, employee or independent contractor of *689 [the advisor] serves or has served as a director of the entity or an affiliate thereof within two years prior to the petition date." (Protocol, n.3). Compliance with the Protocol prevents a director of a debtor who is also an employee of the advisory firm sought to be retained from wielding undue influence over the hiring and compensation of such director's firm. The U.S. Trustee has not objected to the section 363 retention of distressed management consultants in scores, if not hundreds, of cases over the past fourteen years where such consultants have purportedly followed the Protocol.[4]
Significantly, here, the U.S. Trustee's Objection fails to mention the Protocol at all, let alone A & M's compliance in all material respects with each of its requirements. Instead, the Objection on its face ignores the U.S. Trustee's prior position with respect to section 363 retentions and argues that retention of A & M can only be authorized pursuant to section 327(a) of the Code, implying that there was clear error in every case in which a bankruptcy court has in the past approved an A & M retention pursuant to section 363(b). Both the Debtors and A & M speculate in their respective Replies (and counsel for the U.S. Trustee confirmed at the Hearing) that the true origin of the Objection is A & M's alleged non-compliance with footnote three of the Protocol, given Mr. Schipani's service as a director of a lone Debtor entity within two years prior to the Petition Date.
Returning to first principles, the Court finds that the purpose of the Protocol-preventing a consultant from using its position in one capacity to benefit itself in another capacity-has not been violated by A & M here. As emphasized by the Debtors in their Reply, while Mr. Schipani did in fact serve as a director on a single subsidiary board within two years of the Petition Date, neither he nor any other A & M employee has ever served on the parent boards responsible for approving the prepetition or postpetition retention or compensation of A & M. (Debtors' Reply ¶ 20; Schipani Supp. Decl. ¶ 18). Nor did Mr. Schipani's service on certain subsidiary boards overlap with the timing of the consideration of either A & M's 2014 or 2018 engagement letters. Moreover, as the Court has found, Mr. Schipani's service on certain subsidiary boards was done at the discretion and under the direction of the parent boards and primarily involved what can fairly be characterized as ministerial duties and approvals of transactions he had previously vetted in his role as an officer. Accordingly, the circumstances surrounding the concerns which led to the development of the Protocol-avoiding undue influence by a director in the hiring of professionals-are simply not present here, and the Court finds that A & M has *690 complied with the core requirements of the Protocol in all material respects.
For fourteen years, the crisis and interim management industry has relied on the implicit consent of the U.S. Trustee that such firms can be retained in a bankruptcy case pursuant to section 363 rather than section 327 if they meet the requirements of the Protocol, and the industry has developed its business model based on the understanding that the U.S. Trustee would enforce this policy consistently and fairly. To permit the U.S. Trustee to now reverse course in this case would be, in the words of A & M, "starkly inequitable." (A & M Reply ¶ 29). The only explanation the U.S. Trustee has provided for this stunning reversal of policy is that "all bets are off" because of Mr. Schipani's de minimis board service; the economic disruption that his departure would cause is of no concern to the U.S. Trustee. The U.S. Trustee has chosen to take a position that would unquestionably visit damage on this case, this company, and its creditors; he chooses compliance with a footnote over the interests of every creditor in this case.
Courts are tasked with ensuring compliance with the Code and ensuring that the Code is applied with common sense and in a predictable manner. The U.S. Trustee cites to the Supreme Court's decision in Jevic for the proposition that deviating from strict interpretation of the Bankruptcy Code and creating a "rare case" exception to retain professionals pursuant to section 363 who might be ineligible under section 327 should not be permitted, as it may "threaten[ ] to turn a 'rare case' exception into a more general rule." (See Czyzewski v. Jevic Holding Corp. , --- U.S. ----, 137 S.Ct. 973, 986, 197 L.Ed.2d 398 (2017) ). But the U.S. Trustee ignores the Supreme Court's additional statements regarding judicially-created exceptions not specifically found in the Code but which advance significant Code-related objectives. Jevic strictly interpreted the absolute priority rule; however, with respect to other instances "in which a court has approved interim distributions that violate ordinary priority rules," including " 'first-day' wage orders that allow payment of employees' prepetition wages, 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices, and 'roll-ups' that allow lenders who continue financing the debtor to be paid first on their prepetition claims," the Supreme Court stated that "one can generally find significant Code-related objectives that the priority-violating distributions serve." Id. at 985. So too here.
At the Hearing, counsel for the U.S. Trustee characterized the Application's use of section 363 as a "backdoor" way to avoid the limitations of section 327(a) of the Code, including the disinterestedness requirement. When questioned by the Court, counsel for the U.S. Trustee indicated that, if a turnaround consulting firm complies with the Jay Alix Protocol, however, the U.S. Trustee would "exercise his prosecutorial discretion" and not object to the debtor's seeking retention of the firm under section 363(b) instead of under section 327(a). Counsel's explanation in this regard appears to indicate the U.S. Trustee's belief that only the U.S. Trustee, and not the Court, has discretion to create an "exception" to the Code's requirement that professional persons be retained pursuant to section 327 rather than pursuant to section 363 ; i.e. , that it is only permissible for the Court to approve a section 363 retention if the U.S. Trustee approves. This cannot be. If the U.S. Trustee believes he can, through the Protocol, green-light an "exception" to section 327(a) -which the Protocol clearly does-then he cannot arbitrarily revoke such protocol without notice and inflict substantial harm *691 on professionals and debtors who have acted in reliance on over fourteen years of precedent with respect to A & M and other similar advisory firms.
As described by counsel to A & M at the Hearing, companies approaching financial distress have been able to meet their needs for operational resources by engaging management consultancy firms to run the day-to-day management of such companies and, at times, to serve as their interim officers. Engagement of management consultancy firms prior to a bankruptcy filing and their continuing retention postpetition has enabled companies to achieve business continuity during their darkest hour. As aptly pointed out by the Debtors, if, however, section 327 is the only path available for a chapter 11 debtor to retain a restructuring advisory firm and officers supplied by such firm, firms that previously provided firm personnel to fill necessary management roles at the company must be jettisoned when the company files for chapter 11 by virtue of the fact that, having served as officers of the debtor, the firm and its personnel are arguably not disinterested within the meaning of section 101(14) and thus cannot be retained under section 327(a).
This practice would disrupt company management at the precise time when management services are most needed-an absurd result, to say the least. The U.S. Trustee's position in this regard appears to be that the more vital a role an advisory firm played at a company prepetition, the more likely it is that such firm and its personnel will be unable to serve as retained professionals in the company's bankruptcy case pursuant to section 327(a) of the Code. And to what end? Notably and inexplicably, the U.S. Trustee makes the unequivocable statement in its Objection that "[a] debtor cannot use section 363(b) to employ a professional person." (Objection, 21) (citing In re Bicoastal Corp. , 149 B.R. 216, 218 (Bankr. M.D. Fla. 1993) ). It is quite difficult for this Court to reconcile this statement with the statement in the Protocol that the professional "shall seek retention under section 363 of the Bankruptcy Code." (See Protocol § I.C. (emphasis added) ).
The Court declines to elevate form over substance in the manner sought by the U.S. Trustee, Instead, it concludes that rehabilitating a debtor and preserving the value of the debtor's business-significant Code-related objectives-can be best accomplished here by permitting the Debtors to utilize their estate assets under section 363 of the Code to hire the advisory services firm and its personnel who played key management roles at the company prepetition, thus ensuring the continuity of such services. The Court agrees with the observation made by counsel to the Ad Hoc Secured Lender Group at the Hearing that section 363 is "not a backdoor but, rather, an equally appropriate door" on which the Court can consider the retention of A & M and Mr. Schipani.
Even assuming that the U.S. Trustee was not estopped from arguing that the retention cannot be considered under section 363, an argument on which the Court declines to rule at this time, after considering the extensive case law and precedent cited by the parties providing authority for the retention of A & M and Mr. Schipani pursuant to section 363(b) and the Code-related objectives of rehabilitating a debtor and preserving its economic value for stakeholders, the Court finds that the U.S. Trustee's section 363 argument is without merit. For these reasons, the Court finds that nothing precludes the Debtors from relying on section 363(b) to seek authorization for the retention of A & M and Mr. Schipani.
*692 b. The Debtors' Business Decision to Retain A & M and Mr. Schipani is a Sound Exercise of Their Business Judgment
When considering whether to approve a debtor's use of estate property outside the ordinary course of business pursuant to section 363(b), courts review the business judgment of the debtor. The business judgment standard applied by courts presumes that the court will not second guess the business judgment of a debtor's board in making a business decision, provided that the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. See In re Lionel Corp. , 722 F.2d at 1071 ; Off. Comm. of Subordinated Bondholders v. Integrated Resources Inc. (In re Integrated Resources Inc.) , 147 B.R. 650, 656 (S.D.N.Y. 1992) ; In re Global Crossing Ltd. , 295 B.R. 726, 742-43 (Bankr. S.D.N.Y. 2003).
As is evident from the plethora of case law cited by the Debtors and A & M, courts in this District and elsewhere have entered orders permitting management consultant firms to be retained under section 363(b) based upon a finding that the engagement satisfies the business-judgment standard, without requiring applicants to meet a separate burden of proof under section 327(a).
Mr. Schipani's testimony at the Hearing demonstrated that retention of A & M and of Mr. Schipani as Interim CEO are necessary to preserve and maximize the value of the Debtors' businesses and are of critical importance in these cases. During the four years preceding the Petition Date and continuing postpetition, A & M personnel have occupied key management positions and supported existing in-house functions, helping to oversee day-to-day operations, find and pursue corporate opportunities, create and carry out business plans, and otherwise manage the Company at the direction of the board of directors of parent Nine West Holdings, Inc. Mr. Schipani and his team have overseen all aspects of the company's affairs and have developed strong relationships with the Debtors' customers, vendors, and employees, particularly since Mr. Schipani has served as Interim CEO since June 2016. At the Hearing, Mr. Schipani testified in a measured, detailed, and passionate way concerning his responsibilities and role as CEO and acknowledged that he is viewed as the "face of the stability" of the company by creditors, vendors, and the company's 1350 employees, all of whom are counting on him.
As evidenced by the statements in support of the Application filed by six distinct creditor groups representing virtually all major stakeholders across the Debtors' capital structure, the Debtors' creditors believe that the retention of A & M and Mr. Schipani is critical to the Debtors' success. Mr. Schipani recently played a key role in obtaining dramatically increased value for the Debtors in an auction of certain of their businesses (see Dkt. No. 404), and he is expected to be a key participant in discussions regarding chapter 11 resolutions and to play a crucial role in further refining the Debtors' go-forward business plan. (See Debtors' Reply ¶¶ 24-25). In fact, were the Debtors not to seek to retain the continuing services of Mr. Schipani and A & M, it would be a manifestly unreasonable exercise of their business judgment.
Abruptly removing Mr. Schipani and A & M from their management roles at this time, more than four years into A & M's engagement and just as the Debtors are entering the most critical phase in their history as they seek to restructure their obligations in bankruptcy, could, as the Debtors assert, put the success of the entire *693 reorganization at risk. As counsel for the Debtor emphasized at the Hearing, were Mr. Schipani and A & M to be ousted from the roles at this time, there would likely be insurmountable disruption to the Debtors' business. Their experience in managing the company would be impossible to replicate, and any new executive and supporting personnel would have a significant learning curve that the Debtors cannot afford at this time. In addition, as pointed out in a footnote to the Debtors' Reply, the importance of the continued retention of Mr. Schipani and A & M was recently made even more stark due to the resignation of the Debtors' chief financial officer. (See Debtors' Reply ¶ 24, n. 8).
The Debtors have demonstrated that retention of A & M and Mr. Schipani is clearly in the best interests of the Debtors, their estates, and their creditors, and, for all of these reasons, the Court declines to second-guess the business judgment of the parent board with respect to this decision.
II. Section 327 of the Bankruptcy Code
Section 327(a) of the Bankruptcy Code provides that a trustee or debtor in possession "with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a).
"[A] professional person is one who plays an intimate or central role in the administration of the debtor's bankruptcy proceeding." (Objection, 19 (citing Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp., et al. (In re Johns-Manville Corp.) , 60 B.R. 612, 619 (Bankr. S.D.N.Y. 1986) (stating that a professional within the meaning of section 327 is one intimately involved in the administration of the reorganization process, for example, one who played a part in negotiating a plan, who is involved with disposing of or acquiring assets, or who interacts with creditors) ) ). In this Circuit, "professional persons" are defined to include firms or individuals who have been "hired for the purpose of reorganizing the corporation or otherwise assisting it through the Chapter 11 bankruptcy process." In re SageCrest II, LLC , Nos. 3:10CV978, 3:10CV979, 2011 WL 134893, at *7 (D. Conn. Jan. 14, 2011).
In SageCrest II , the Court explained that "[o]fficers responsible for the day-to-day business of the debtor ... stand in contrast to professionals hired for the sole purpose of reorganizing the debtor organization." Id. (emphasis added); see also In re Phoenix Steel Corp. , 110 B.R. 141, 142 (Bankr. D. Del. 1989) (finding that workout managers hired as officers to evaluate company's financial condition and oversee day-to-day operations were not "professional persons" within the meaning of section 327(a) ); In re Dairy Dozen-Milnor, LLP , 441 B.R. 918, 920 (Bankr. D.N.D. 2010) (stating that a "professional person" under section 327(a) is one who "takes a central role in the administration of the debtor's bankruptcy estate and bankruptcy proceedings as opposed to one who provides services to the debtor that are necessary regardless of whether a bankruptcy petition was filed"); In re Seatrain Lines, Inc. , 13 B.R. 980, 981 (Bankr. S.D.N.Y. 1981) (concluding that maritime engineers hired by the debtor were not "professional persons" because they did not play a central role in the administration of the bankruptcy case and the need for their employment did not arise from the bankruptcy itself).
The U.S. Trustee argues that A & M and Mr. Schipani, are "professional persons" within the scope of section 327, as *694 they "specialize in financial and operational restructuring" and, "[d]espite the label of Interim CEO, they are intimately involved in the restructuring of the Debtors' businesses and are central to the reorganization." (Objection, 18). In support of his assertion, the U.S. Trustee points to the fact that Mr. Schipani and A & M personnel, among other things, have prepared each of the Debtors' schedules and SOFAs; have assisted in claims work and in reviewing various contracts for the Debtors to determine which contracts to assume or reject; are preparing the Debtors' 13-week cash flow forecast; have been assisting with the debtor-in-possession financing; and were intimately involved in the postpetition sale of a substantial portion of the Debtors' business where they evaluated bids, qualified certain bids, and participated in the auction which ultimately led to a very significant sale for the Debtors. (See Objection, 18-19).
After listing these tasks (and others) in the Objection, the U.S. Trustee concludes that Mr. Schipani and A & M have been assisting the Debtors on "nearly every major element" of a large chapter 11 case and, thus, unquestionably are professional persons within the meaning of section 327(a) who must be retained under such Code section. (Objection, 18-19).
In contrast, A & M contends that Mr. Schipani and A & M, who were engaged over four years ago to manage the day-to-day operations of the company's businesses and not for the express purpose of administering the then-nonexistent bankruptcy estates, are not "professional persons" within the meaning of section 327(a). The Court agrees. Here, there can be no doubt that the SageCrest "hired for the purpose of reorganizing" formulation is inapplicable to A & M.
A & M was hired four years before the Petition Date, and, since that time, Mr. Schipani and other A & M personnel have managed the company, providing services that would be needed independent of any bankruptcy filing. The evidence supports this conclusion. As stated by Mr. Schipani in his Supplemental Declaration and at the Hearing, A & M was not hired to restructure the obligations of the company, and nothing in A & M's 2014 engagement related to bankruptcy planning; rather, it was not until approximately three years after the engagement began, during the summer of 2017, that the company, in consultation with advisors and independent of A & M's activities and responsibilities, began considering the possibility of a bankruptcy filing. (Schipani Suppl. Decl. ¶ 6).
Since the Petition Date, A & M has continued in its role of managing the daily operations of the Debtors' businesses; any services it has performed relating to the Debtors' chapter 11 processes have been services that could have been performed by existing company personnel, rather than A & M personnel, had the necessary resources been available within the company. (See Schipani Suppl. Decl. ¶ 7). During the chapter 11 cases, A & M has continued to provide the types of services it has provided to the company for years, and such work supports the professionals hired by the Debtors specifically for bankruptcy purposes, in Mr. Schipani's words, "in the same way that in-house employees and officers of any company going through a restructuring typically would in my experience." (Schipani Suppl. Decl. ¶ 8). As A & M correctly asserts, "because the firm is not tasked with actually administering the bankruptcy estate," it does not fall within the definition of a "professional person" under section 327(a). (A & M Reply ¶ 6).
At the Hearing, counsel for A & M elicited testimony from Mr. Schipani which illustrated that the services he provides to the company postpetition have remained largely unchanged, albeit augmented by *695 certain bankruptcy-related responsibilities such as attending section 341 meetings and preparing monthly operating reports. He compared his prepetition and postpetition responsibilities as CEO, testifying that, during both periods, he has been responsible for, among other things, monthly reporting; managing cash flows; controlling inventory; sales of assets; and negotiating the company's financing. For instance, Mr. Schipani testified that, in 2016, he coordinated the sale of the Easy Spirit brand and, during the chapter 11 cases, he worked on the sale of the Nine West brand; he was also responsible for negotiating amendments to the prepetition credit agreement much as he did in connection with the DIP credit agreement. Mr. Schipani's testimony was supported by a comparison of the scope of services set forth in the A & M 2014 Engagement Letter and in A & M's 2018 postpetition engagement letter. Mr. Schipani likened his role as Interim CEO to the role of other CEOs at distressed companies such as that of the CEO of Chemtura, with whom he worked closely.
The Court declines to find here that Mr. Schipani and A & M are "professional persons" as such term is utilized in section 327(a) of the Code. Their roles-both prepetition and postpetition-are focused on running the business. As Mr. Schipani's testimony made clear, the services that they have provided to support the Debtors' bankruptcy-specific professionals are largely work that the officers and managers of any bankrupt entity would have to do in the ordinary course. It would be an absurd result if their work in such roles was sufficient to render them "professional persons;" if this were the case, virtually every senior executive of every chapter 11 debtor would have to be retained under section 327(a). This simply cannot be.
As the Court has determined that section 327(a) does not apply to the retention of A & M and Mr. Schipani in these cases, it need not reach the U.S. Trustee's additional argument that they are not "disinterested" under section 101(14) of the Code and thus fail to meet the requirements of section 327(a).
For all of the foregoing reasons, the Objection is overruled, the Application is granted, and the Debtors are authorized to retain A & M to provide the Debtors with an interim CEO and certain additional personnel and to designate Mr. Schipani as Interim CEO pursuant to section 363(b) of the Bankruptcy Code. The Debtors are directed to submit an order consistent with this Bench Decision.

This decision was dictated on the record of the hearing held on June 28, 2018. It has been modified to include full citations and defined terms, and reflects minor additional non-substantive modifications. The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

See https://www.justice.gov/sites/default/files/ust/legacy/2014/08/11/J_Alix_Protocol_Engagement.pdf.

Notably, courts in this District and others have approved the retention of restructuring advisors pursuant to section 363(b) well before the U.S. Trustee first implemented the Protocol. See, e.g., In re Adelphia Commc'ns. Corp. , No. 02-41729 (Bankr. S.D.N.Y. July 31, 2002) [Dkt. 253] (authorizing the retention of a restructuring advisory firm to provide personnel, including a CRO, pursuant to section 363(b) ); In re Enron Corp. , No. 01-16034, 2002 WL 32150520 (Bankr. S.D.N.Y. Apr. 4, 2002) [Dkt. 2725] (authorizing the debtors to enter into an agreement with a consulting firm which then provided an individual as Acting CEO and CRO, and certain additional personnel pursuant to section 363(b) ); In re Iridium Operating, LLC , No. 99-45005 (Bankr. S.D.N.Y. Oct. 12, 1999) [Dkt. 86] (authorizing and approving the terms of retention for restructuring officers pursuant to sections 105(a) and 363(b) ); In re Bill's Dollar Stores, Inc. , No. 01-0435 (Bankr. D. Del. Mar. 14, 2001) [Dkt. 141] (authorizing the continued retention of an advisory firm to provide the debtors with interim management through their Interim CEO and CRO pursuant to section 363(b) ).